IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| WILLIAM N. LATORRE, et al., | : | CIVIL ACTION |
| | : | NO. 15-5251 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DOWNINGTOWN AREA SCHOOL | : | |
| DISTRICT, et al., | : | |
| | : | |
| Defendants. | : | |


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                        May 22, 2017


        Plaintiffs William LaTorre and his company, LaTorre
Consulting, Inc. (together, "Plaintiffs"), bring this action
against Downingtown Area School District and its superintendent,
Lawrence Mussoline (together, "Defendants"). Plaintiffs allege
that Defendants retaliated against them, in violation of the
First Amendment, after LaTorre spoke to a reporter about a
matter involving a student. Each side has now moved for summary
judgment. For the reasons that follow, the Court will deny both
motions.

## I.   BACKGROUND

During the 2013-2014 and 2014-2015 school years, Plaintiff William LaTorre worked at Downingtown East High School – a facility of Defendant Downingtown Area School District ("DASD" or "the School District") – as an armed school resource officer.[1] LaTorre Dep. 51:16-24, Apr. 6, 2016, ECF Nos. 20-1, 20-2, 20-3, 20-4. In that position, LaTorre was "watching kids come in the building, parking cars, or whatever, just general security of the school." Mussoline Dep. 12:13-15, Apr. 12, 2016, ECF No. 18-1.

For the 2014-2015 school year, LaTorre was also hired in a new DASD position: Chief Security Officer ("CSO"). See id. at 61:19-24; LaTorre Dep. 61:7-18. Specifically, on September 24, 2014, DASD signed a contract with Plaintiff LaTorre Consulting, Inc. ("LCI"); LaTorre owns LCI and is its only employee. See Contract Services Agreement, ECF No. 20-4; LaTorre Dep. 10:8-11, 42:6-11. As CSO, LaTorre – through LCI – was

> responsible to oversee all security matters, including, but not limited to, review of and advice on video surveillance and other security needs and operations (including cyber security), consult with and meet with CLIENT and its representatives on a routine basis, coordinate and supervise drills designed to enhance the safety and improve emergency response (including the establishment of an incident command system and protocol and training thereon),

---

[1]      During this time, his work was through a security company called Signal 88, which is not a party to this case.

> serve as a liaison and periodically interface with all
> relevant law enforcement agencies, emergency
> responders (fire, ambulance, etc.) and any CLIENT
> private security service engaged, survey, assess, and
> provide written recommendations to enhance security
> regarding all of CLIENT's facilities and CLIENT's
> Emergency Operations and Communications Plans and
> advise and consult on all relevant policies, Codes of
> Conduct and protocols related to any security issue.

Contract Services Agreement at ¶ 2. The contract further noted that "[t]his Scope of Services is not intended to identify each and every area for which CONTRACTOR shall have responsibility, and is not intended to limit the CONTRACTOR's responsibility under this Agreement. The CLIENT shall have the right under this Agreement to identify any other area of security for which CONTRACTOR shall be responsible." Id.

The incident underlying this lawsuit began on September 30, 2014, just a few days after LCI and DASD entered into the contract. That morning, Gordon's Sports Supply – a sporting goods and hunting supply store in Eagle, Pennsylvania – contacted the police regarding an attempted break-in and potential theft the night before. Jones Dep. 7:17-8:21, Apr. 15, 2016, ECF No. 20-7. Based on surveillance videos, the responding detective – Detective Jones – concluded that (1) a crossbow scope – but no ammunition, guns, or anything else – had been taken, id. at 9:23-10:15; and (2) the perpetrator was a boy, approximately 13 years old, id. at 13:3-14:3. Because of the apparent age of the boy – that is, knowing that the boy would

3

have been a student – Detective Jones contacted LaTorre for help identifying the boy. Id. at 16:2-10. Jones provided LaTorre with stills from the surveillance videos, and LaTorre was able, later that day, to identify the boy as a student at Lionville Middle School ("the student"). Id. at 18:24-21:1. The student's belongings were checked, and it was determined that he "was not in possession of [any stolen items] at the school." Id. at 31:6-23.

That same afternoon, while LaTorre, Jones, and school administrators were investigating this situation, the DASD public relations director, Pat McGlone, got a call from Mike Neilon, a television reporter. Mussoline Dep. 14:19-23; 16:10-21. The reporter told McGlone that the news station was dispatching a news crew to Lionville because they had learned that there was a child in the school with weapons and ammunition, and that there was possibly an active shooter situation. Id. at 14:24-15:3. After confirming with Lionville and DASD officials that Neilon's information was false, and that the student had no weapons, the DASD superintendent, Defendant Lawrence Mussoline, instructed McGlone to call Neilon back and tell him that his information was wrong. Id. at 15:4-16, 17:10-21. McGlone did so, but Neilon said he would not call off the news team because his source was "excellent." Id. at 15:17-19, 17:4-6.

LaTorre was aware that the media was pursuing a story at Lionville because he was on a call Mussoline made to confirm Lionville's information. LaTorre Dep. 137:25-140:17. He also learned from Detective Jones, later that afternoon, that the news station had a news van parked at Gordon's Sports Supply, which happened to be located across the street from the police station. Id. at 145:25-146:15. Detective Jones expressed his concern, which LaTorre shared, about getting the student into the police station – without attracting the attention of the news van – for the purposes of formally interviewing him, completing paperwork, etc. Id. at 146:13-147:18.[2] As a result of this conversation, LaTorre called Rob Reed, a DASD official, to inform him that a news van was parked across the street from the police station. Id. at 148:17-149:11. In response, Reed said that other school district employees had gone home for the day, and that they would pick up the issue the next day. Id. at 149:12-18.[3]

LaTorre then called Neilon, for the purpose of

_____

[2] For his part, Detective Jones disputes that this conversation occurred. He testified that, to his knowledge, there was never a news van outside Gordon's, and that he never told LaTorre there was a news van near the police station. Jones Dep. 34:16-35:21.

[3] Reed remembers that this phone call occurred, but does not remember what he and LaTorre discussed. Reed Dep. 12:1-13:25, Apr. 22, 2016, ECF No. 20-11.

"see[ing] if [LaTorre] could exercise influence on [Neilon] to not cover a story on this child." Id. at 149:21-150:13. Specifically, LaTorre told Neilon, "I think you should kill the story. There's nothing there." Id. at 152:10-14. Neilon informed LaTorre that the District Attorney's Office was also "telling him to back off" and that Neilon had decided to do so by pulling the news van. Id. at 153:7-10.

Mussoline was "ecstatic" that LaTorre "was able to get the vans called off." Mussoline Dep. 27:18-23. But he was also very concerned about the source of Neilon's false information, and why Neilon thought the source was so solid that McGlone could not persuade Neilon that the story was false. Id. at 27:1-17. Mussoline asked Neilon whether he could confirm or deny that LaTorre was Neilon's original source. Id. at 28:3-9. Neilon said that while he could confirm that LaTorre called off the news vans, he would not say who gave him the false information in the first place.[4] Id. at 28:10-20. In general, Mussoline's confidence in LaTorre "was waning because of Neilon's confirmation that he had had this ability [to get the news vans called off] that Ms. McGlone apparently lacked." Id. at 32:7-11.

On October 1, the day after the investigation and

_____

[4]      According to LaTorre, Neilon claimed that he did not know who the source was, except that it was a DASD administrator. LaTorre Dep. 190:4-192:1.

LaTorre's conversation with Neilon, Mussoline suspended LaTorre.
Id. at 30:2-9. He also instructed Signal 88 that LaTorre could
not perform services for DASD as an employee of Signal 88 while
suspended. Compl. Ex. F, ECF No. 1. Over the next few days,
Mussoline interviewed several people in an effort to determine
who gave false information to Neilon. Mussoline Dep. at 36:7-
41:20. At the conclusion of these interviews, Mussoline
determined that he had "just . . . lost confidence" in LaTorre,
id. at 48:5-6, and, at the advice of the district solicitor,
decided that this loss of confidence justified the termination
of the contract between DASD and LCI, id. at 48:6-11.
Accordingly, on October 6, Mussoline met with LaTorre. According
to LaTorre, Mussoline told LaTorre that he had no proof LaTorre
was the leak, and then said: "I really wish you would have told
me that you called the media to cancel their response to the
child at the police station. . . . We need people we can trust.
And I'm going to exercise the contract." LaTorre Dep. 198:18-25.
In LaTorre's view, Mussoline "seemed more upset that he didn't
know" that LaTorre placed the call to Neilon than the fact that
LaTorre did place the call. Id. at 232:15-20.

    At any rate, on October 6, DASD terminated its
contract with LCI and LaTorre. Compl. Ex. G, ECF No. 1.

    LaTorre and LCI ("Plaintiffs") filed the instant
action on September 21, 2015. The complaint contained two

counts, both alleging violations of the First Amendment – one as to Mussoline and one as to DASD. ECF No. 1. Defendants filed a motion to dismiss, ECF No. 7, which the Court denied, ECF No. 16. Defendants then filed an answer, ECF No. 17, and the parties engaged in discovery. Thereafter, on May 20, 2016, Plaintiffs and Defendants filed cross-motions for summary judgment. ECF Nos. 18, 19. They also filed responses to each other's motions, ECF Nos. 22, 23, and the Court held a hearing on the motions on April 18, 2017, see ECF No. 25. The motions for summary judgment are now ripe for disposition.

## II. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." <u>Pignataro v. Port Auth.</u>, 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

The guidelines governing summary judgment are identical when addressing cross-motions for summary judgment. <u>See</u> <u>Lawrence v. City of Phila.</u>, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." <u>Schlegel v. Life Ins. Co. of N. Am.</u>, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (Robreno, J.) (alteration in original) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)).

**III. DISCUSSION**

Plaintiffs' claim is that DASD and Mussoline terminated the contract, in violation of the First Amendment, in retaliation for LaTorre speaking to Neilon about calling off the news vans. Defendants request that the Court enter judgment in their favor and close the case. Plaintiffs request that the Court enter judgment in their favor as to liability, presumably leaving damages for resolution through settlement or trial.

The same legal framework applies to both motions: "To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014) (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)).

Important factual distinctions between this case and the typical First Amendment retaliation case[5] complicate the application of this legal framework. Commonly, First Amendment retaliation cases involve an employee who spoke negatively

_____

[5] Indeed, the parties have not identified – and the Court has not found – any cases with remotely similar facts.

10

and/or critically about her government employer, or who publicly revealed information the government would have preferred to conceal. Here, in contrast, the content of the speech at issue – which concerned keeping false information from the public, rather than revealing true information to the public – benefitted everyone. See Mot. Summ. J. Hr'g Tr. 23:9-21, Apr. 18, 2017, ECF No. 26 (defense counsel calling this a "unique case" in the context of First Amendment retaliation claims because "there is [no] dispute that the effect of him calling Mr. [Neilon] and the content of what he said were fine, and in fact, aligned with the school district's interest that day"). Moreover, one of the employee's jobs was brand new to both him and the government; he was the first to hold the position and had been doing it for less than a week before the incident occurred.

As a result of this case's unusual – if not unique – factual position, the Court's analysis is not nearly as straightforward as either motion for summary judgment contends. At any rate, this memorandum proceeds with analysis of each of the components of a First Amendment retaliation claim, in turn.

A.     Whether the Speech Is Protected

In order to establish the first element of the employee's burden of proof – that the speech at issue is

protected by the First Amendment – the employee must demonstrate
that (1) he spoke as a citizen, not as an employee; (2) the
speech involved a matter of public concern; and (3) the
government lacked an adequate justification "for treating the
employee differently than the general public based on its needs
as an employer." Dougherty, 772 F.3d at 987.

      1.   Whether LaTorre Spoke as a Citizen

      The first question is whether LaTorre spoke as a
citizen or as a school district employee when he asked Neilon to
call off the news vans.

      If LaTorre spoke as an employee, his speech is not
protected by the First Amendment. Garcetti v. Ceballos, 547 U.S.
410, 421 (2006). In order to determine whether an individual
spoke as an employee, a court must ask whether the individual's
speech was made "pursuant to [his] official duties." Id. More
specifically, "the critical question under Garcetti is whether
the speech at issue is itself ordinarily within the scope of the
employee's duties, not whether it merely concerns those duties."
Lane v. Franks, 134 S. Ct. 2369, 2379 (2014). This inquiry "is a
practical one," as "[f]ormal job descriptions often bear little
resemblance to the duties an employee actually is expected to
perform, and the listing of a given task in an employee's
written job description is neither necessary nor sufficient to

demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Garcetti, 547 U.S. at 424-25.

"Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." Dougherty, 772 F.3d at 988 (quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007)). Specifically, "the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." Flora v. County of Luzerne, 776 F.3d 169, 175 (3d Cir. 2015).[6] In other words, if there is no genuine dispute of material fact as to the scope of a plaintiff's job duties, a court may determine, as a matter of law, whether the speech at issue fell into the ordinary scope of those duties. The Third Circuit has articulated four non-

---

[6]     As the Sixth Circuit recently discussed, there is a circuit split over this issue. The Third, Seventh, Eighth, and Ninth Circuits "have concluded that 'whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law, while the D.C., Fifth, and Tenth Circuits" have held that it is solely a question of law. Mayhew v. Town of Smyrna, No. 16-5103, 2017 WL 1947877, at *4 (6th Cir. May 11, 2017) (quoting Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 350 (6th Cir. 2010)). The Sixth Circuit sided with the D.C., Fifth, and Tenth Circuits, holding that "the determination as to whether [a plaintiff] engaged in protected speech [is] one of law," not a mixed question of fact and law. Id. at *5. Of course, because the Third Circuit has disagreed, this holding has no impact on the issues presently before the Court.

comprehensive factors that a court should consider in this
analysis:

> (1) whether the employee's speech relates to "'special
> knowledge' or 'experience' acquired through his job,
> Gorum, 561 F.3d at 185) (citing Foraker, 501 F.3d at
> 240); (2) whether the employee raises complaints or
> concerns about issues relating to his job duties 'up
> the chain of command' at his workplace, Foraker, 501
> F.3d at 241; (3) whether the speech fell within the
> employee's designated responsibilities, Gorum, 561
> F.3d at 186; and (4) whether the employee's speech is
> in furtherance of his designated duties, even if the
> speech at issue is not part of them. See Foraker, 501
> F.3d at 243.

Kimmett v. Corbett, 554 F. App'x 106, 111 (3d Cir. 2014)

(footnote omitted).

Here, several issues preclude a holding either that

LaTorre necessarily spoke as an employee, as Defendants urge, or

that LaTorre necessarily spoke as a citizen, as Plaintiffs urge.

First, as a practical and general matter, it is

difficult, at best, to pronounce the scope of LaTorre's ordinary

job duties undisputed, considering that the job had existed for

only a few days when the incident occurred. See Hrg' Tr. 26:11-

13 ("He was on the job for only a week, which hampers, to some

extent, our analysis of what the job included . . . ."). There

is little basis for determining the actual scope of LaTorre's

expected duties, other than his job description – which, again,

the Supreme Court has warned courts to avoid relying on. See

Garcetti, 547 U.S. at 424-25 ("Formal job descriptions often

bear little resemblance to the duties an employee actually is expected to perform . . . .”). Arguably, then, because the scope of a plaintiff's job duties is a question of fact, this matter should be reserved for a trier of fact. Indeed, counsel for Plaintiffs even conceded at the hearing on these motions that “just maybe, a jury might have to determine” the scope of LaTorre's duties in the CSO position. Hr'g Tr. 9:21-10:13.

But even setting aside that particular problem, and considering the constitutional significance of the speech in light of the limited information that does exist, the Kimmett factors can point either way depending on whether the facts are viewed in the light most favorable to Plaintiffs or to Defendants. Specifically, the second and third factors clearly point in Plaintiffs' favor, while the first and fourth clearly point in Defendants' favor: It is evident that LaTorre's speech did not involve raising intra-workplace issues up his own chain of command, and also that interfacing with the media was not explicitly designated in his job description. These considerations support Plaintiffs' argument that LaTorre spoke as a citizen, not as an employee. On the other hand, it is also evident that LaTorre's speech related to knowledge he acquired through his job, and that the speech was made in furtherance of duties that were designated in his job description. These considerations support Defendants' argument that LaTorre spoke

as an employee, not as a citizen.

Therefore, viewing the big picture of this incident from two different perspectives, a reasonable jury could find for either side. Viewing the facts in the light most favorable to Defendants – specifically, the facts that LaTorre learned the information he relayed to Neilon through a meeting and conversations he participated in as part of his undisputed job duties, that LaTorre called a school administrator to pass on portions of the information before calling Neilon, and that LaTorre knew the school district desired the outcome he sought by placing the phone call – a reasonable jury could determine that LaTorre "intended to carry out the intentions of both the District administration and Police Department to eliminate or correct any coverage of the false 'lockdown' story being pursued by the media."[7] Defs.' Mem. Law at 19, ECF No. 19-2. Cf. <u>McAndrew</u> <u>v. Bucks Cty. Bd. of Comm'rs</u>, 183 F. Supp. 3d 713, 733-34 (E.D. Pa. Apr. 29, 2016) (determining that speech was employee speech, not citizen speech, where the plaintiff – perhaps mistakenly – believed he was working when he made the speech). Conversely, viewing the facts in the light most favorable to Plaintiffs, a

---

[7]     It may well be true, no matter what, that LaTorre was <u>also</u> concerned for and motivated by the child's wellbeing, as he contends. But that would not somehow cancel out a finding that his speech was made pursuant to his job duties, as Plaintiffs urge; people are capable of acting from multiple motivations.

reasonable jury could agree with Plaintiffs that the very reason his speech was allegedly troubling to Mussoline "is that it was not within his job duties."[8] Pls.' Br. at 13, ECF No. 18. In other words, Mussoline was concerned by LaTorre's speech <u>because</u> he did not expect LaTorre to place the phone call – and if Mussoline did not expect LaTorre to place the phone call, the phone call could not have been part of the "tasks he was paid to perform." <u>Garcetti</u>, 547 U.S. at 422.

Because, on the record before the Court at this time, a reasonable jury could find for either Plaintiffs or Defendants on this issue, genuine issues of material fact remain as to whether LaTorre spoke as an employee or a citizen. This factor therefore supports neither of the motions for summary judgment.[9]

> 2.   <u>Whether the Speech Involved a Matter of Public Concern</u>

The next question in determining whether LaTorre's speech is protected by the First Amendment is whether the speech involved a matter of public concern.

---

[8]      Plaintiffs also rightly point out that Defendants make no attempt to explain how Plaintiff's speech was made pursuant to his ordinary duties in his security officer role with Signal 88, which was also terminated pursuant to this incident. <u>See</u> Pls.' Resp. at 13, ECF No. 23.

[9]      Indeed, because Plaintiffs must prove all elements of the protected-speech element, this determination is sufficient to defeat Plaintiffs' motion for summary judgment. For the sake of completeness, however, this memorandum will continue to analyze the remaining arguments in Plaintiffs' motion.

"[S]peech implicates a matter of public concern when 'it can be fairly considered as relating to any matter of political, social or other concern to the community,' or when 'it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" Munroe v. Central Bucks Sch. Dist., 805 F.3d 454, 467 (3d Cir. 2015) (citations omitted) (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Hill v. Borough of Kutztown, 455 F.3d 225, 242 (3d Cir. 2006) (quoting Rankin v. McPherson, 483 U.S. 378, 384-85 (1987)). Courts are instructed to "take into account the employee's motivation as well as whether it is important to our system of self-government that the expression take place." Munroe, 805 F.3d at 467.

Here, again, the type of speech at issue is uncommon, if not unique, in First Amendment case law: the speech furthered the goal of keeping false information from the public, rather than revealing true information to the public. Nonetheless, even viewing the facts in the light most favorable to Defendants, no reasonable jury could find that LaTorre's speech was not on a matter of public concern. Certainly, the public has a legitimate interest in news relating to shootings at public schools – and

in the prevention of false reports on the same subject,
considering that such reports could incite unnecessary panic in
the community. Accordingly, LaTorre's speech "can 'be fairly
considered as relating to [a] matter of political, social or
other concern to the community.'" Munroe, 805 F.3d at 467
(quoting Snyder, 562 U.S. at 453).

Defendants' best argument is that the context in which
the statements were made is private. See Miller v. Clinton Cty.,
544 F.3d 542, 550 (3d Cir. 2008) ("We can not 'cherry pick'
something that may impact the public while ignoring the manner
and context in which that statement was made or that public
concern expressed. Our inquiry must also consider the form and
circumstance of the speech in question."). It is true, as
Defendants argue, that LaTorre's speech was in the interests of
the school district, as well as private individuals like the
student and his parents.[10] It is also true that his speech was
made privately. But neither of those facts mean that the speech
was not also "a subject of general interest and of value and
concern to the public." Munroe, 805 F.3d at 467. See, e.g.,
Beyer v. Duncannon Borough, 428 F. App'x 149, 154 (3d Cir. 2011)
("Beyer's personal interest in the discussion of AR-15s because

---

[10]     For his part, LaTorre claims that he was motivated by
a desire to protect the student, who has a disability. He goes
on to argue that there is a public concern inherent in advocacy
on behalf of disabled students.

of his recommendation to purchase the weapons does not lead to
the conclusion that the speech is of purely personal
interest."); Fryer v. Noecker, 34 F. App'x 852, 853-54 (3d Cir.
2002) ("It is important to note that the case law is very clear
that matters are not disqualified from being matters of public
concern simply because they touch on individuals and their
desires. To the contrary, . . . a matter will be deemed a matter
of public concern if it is the type of issue that is important,
in a self-governing society, for public employees to be free to
express themselves about." (citations omitted)); Azzaro v. Cty.
of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) ("If the content
and circumstances of a private communication are such that the
message conveyed would be relevant to the process of self-
governance if disseminated to the community, that communication
is public concern speech even though it occurred in a private
context.").

     Importantly, moreover, LaTorre's speech did not
concern personal grievances about his job, which is a type of
speech that is clearly unprotected by the First Amendment. See,
e.g., Miller, 544 F.3d at 550 (finding speech unprotected, even
though it "touche[d] on a matter of public concern" where it
focused on the plaintiff's "private grievances as an employee").

     Accordingly, the Court finds that LaTorre's speech
involved a matter of public concern. This conclusion is

necessary, but not sufficient, to the success of Plaintiffs'
motion for summary judgment, and does not defeat Defendants'
motion for summary judgment.

### 3. Whether Defendants Had an Adequate Justification

The third and final factor in determining whether
LaTorre's speech is protected by the First Amendment is whether
Defendants had an adequate justification "for treating the
employee differently than the general public based on its needs
as an employer." Dougherty, 772 F.3d at 987. Defendants make no
argument with respect to this factor, except a brief mention
during the hearing on these motions.[11] Plaintiffs do contend, as
they must, that Defendants had no adequate justification, based
on their needs as employers, for terminating the contract.

This consideration in the First Amendment analysis
"reflects the importance of the relationship between the
speaker's expressions and employment." Garcetti, 547 U.S. at

---

[11] At the hearing, when asked if Defendants had adequate
justification for the termination of the contract, defense
counsel said, "I think that if you proceed with the analysis,
there was adequate justification but we don't even get there
under the applicable law, Garcetti, Lane vs. Franks. They have
to prove protected speech, and that's analyzed in terms of, was
he speaking as a citizen, and was it a matter of public
concern?" Hr'g Tr. 27:10-16. This argument is, at best,
incomplete, as "adequate justification" is itself an element of
the protected-speech analysis, and not a separate consideration
to reach only after determining whether speech is protected. See
Dougherty, 772 F.3d at 987. This apparent misunderstanding
perhaps explains Defendants' failure to address this prong in
their briefing.

418. That is, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions." Id. Without such control, "there would be little chance for the efficient provision of public services." Id. Cf. Arnett v. Kennedy, 416 U.S. 134, 168 (1974) (noting, in the context of due process, that "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation"). Indeed, speech by public employees can sometimes "express views that contravene governmental policies or impair the proper performance of governmental functions"; not all such speech is protected by the First Amendment. Garcetti, 547 U.S. at 419.

In order to determine whether Defendants had an adequate justification for its treatment of Plaintiffs, the Court must ask whether LaTorre's "interest in the speech outweighs any potential disruption of the work environment and decreased efficiency of the office." Curinga v. City of Clairton, 357 F.3d 305, 312 (3d Cir. 2004). "When evaluating the disruption, [the Court should] consider 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the

regular operation of the enterprise,' as well as 'the hierarchical proximity of the criticizing employee to the person or body criticized.'" Kimmett, 554 F. App'x at 113 (quoting Rankin, 483 U.S. at 388; Baldassare v. New Jersey, 250 F.3d 188, 199 (3d Cir. 2001)).

Here, Plaintiffs argue that Defendants had no adequate justification for firing Plaintiffs because LaTorre's speech "eliminate[ed] . . . a threat of disruption that might have resulted from unwelcome publicity," rather than creating a disruption. Pls.' Resp. at 16, ECF No. 23. In so arguing, Plaintiffs miss the point of this factor. It is undisputed that LaTorre's phone call to Neilon at least contributed to the elimination of the disruption of a false news story about the school and/or one of its students. But that does not mean that the phone call could not also have caused any disruptions in the functioning of the internal workplace of the school. Viewing the facts in the light most favorable to Defendants, a reasonable jury could agree, for example, that a school superintendent might not want his chief security officer to place calls to the media about matters of school security without first having authorization to do so.[12] Indeed, as discussed above, Mussoline

---

[12]     This argument, of course, conflicts with Defendants' argument that the phone call to Neilon was within the ordinary scope of LaTorre's job duties, such that LaTorre spoke as an

testified that he lost confidence in LaTorre due to LaTorre's handling of the situation, and LaTorre even testified that Mussoline seemed more upset that LaTorre had not told anyone he was making the phone call than that LaTorre had placed the call in the first place. These considerations could lead a reasonable finder of fact to determine that LaTorre's speech had a detrimental impact on working relationships and school operations. If so, that impact could be sufficient, as a matter of law, to outweigh LaTorre's interest in making the speech.

Accordingly, there remain genuine disputes of material fact as to whether Defendants had an adequate justification for their termination of the contract. This conclusion is sufficient to deny Plaintiffs' motion for summary judgment.

● ● ●

In summary, Plaintiffs have failed to show that no genuine disputes of material fact exist as to all three of the above factors, while Defendants have failed to show that no genuine disputes of material fact remain as to at least one of the above factors, and that they are entitled to judgment as a result. Accordingly, Plaintiffs have failed to establish that LaTorre's speech is necessarily protected by the First

---

employee. But these arguments can exist in the alternative; only one needs to succeed for Defendants to be entitled to judgment.

Amendment, and Defendants have failed to establish that
LaTorre's speech is necessarily unprotected by the First
Amendment.

Because Plaintiffs carry the burden as to this element
and cannot win judgment without prevailing on it, the Court will
deny Plaintiffs' motion for summary judgment. As to Defendants'
motion, one issue remains.

B. Whether the Speech was a Substantial Factor in the
Termination Decision

Assuming that LaTorre's speech is protected by the
First Amendment, the next question – and the second element of
the First Amendment retaliation analysis – is whether LaTorre's
speech "was a substantial or motivating factor" in Defendants'
choice to fire Plaintiffs. Dougherty, 772 F.3d at 986. "[T]his
step embraces two distinct inquiries: 'did the defendants take
an action adverse to the public employee, and, if so, was the
motivation for the action to retaliate against the employee for
the protected activity.'" Schneck v. Saucon Valley Sch. Dist.,
340 F. Supp. 2d 558, 568 (E.D. Pa. 2004) (quoting Merkle v.
Upper Dublin Sch. Dist., 211 F.3d 782, 800 n.3 (3d Cir. 2000)
(Greenberg, J., concurring in part and dissenting in part)).

This element is a question of fact. Gorum, 561 F.3d at
184; McGreevy v. Stroup, 413 F.3d 359, 365-66 (3d Cir. 2005);
Curinga, 357 F.3d at 310. Accordingly, the Court may grant

summary judgment on this basis only if there are no genuine questions of fact to be decided by a jury. See Hill v. City of Scranton, 411 F.3d 118, 127 (3d Cir. 2005). That is, the Court may not rule on this issue if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Here, of course, because there are cross-motions for summary judgment, the Court must evaluate the facts in the light most favorable to each side, and decide this issue only if one side would necessarily win both times.

That is not the case here, where the facts are not so decisive that a reasonable jury could only find for one side. To the contrary, while many of the bare facts are undisputed, the inferences to be drawn from them are not. Viewing the facts in the light most favorable to Plaintiffs, LaTorre's speech was, at the least, the initial force that led to the termination of the contract, and thus was a "substantial or motivating factor." On the other hand, viewing the facts in the light most favorable to Defendants, the speech itself was merely a tangential event – not unrelated to the action that was ultimately taken, but not the source of a motivation to retaliate. See Schneck, 340 F. Supp. 2d at 568 (quoting Merkle, 211 F.3d at 800 n.3 (Greenberg, J., concurring in part and dissenting in part)).

In fact, even in Plaintiffs' view, Defendants likely fired Plaintiffs because Mussoline suspected that LaTorre

originally supplied Neilon's faulty information. If so, and if Mussoline was wrong, the termination of Plaintiffs' contract may have been unfair – but not necessarily unconstitutional. That firing would arise to a constitutional level only if LaTorre's phone call to Neilon – if protected in the first place – was a substantial or motivating factor in the process. See Borough of Duryea v. Guarnieri, 564 U.S. 379, 391-92 (2011) ("It is precisely to avoid this intrusion in internal governmental affairs that this Court has held that, 'while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.'" (quoting Garcetti, 547 U.S. at 420)); Forgarty v. Boles, 121 F.3d 886, 890 (3d Cir. 1997) ("Justice O'Connor made it clear that statutory rights and constitutional rights in the employment context are not coextensive: 'We have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information.'" (quoting Waters v. Churchill, 511 U.S. 661, 679 (1994))).[13]

---

[13]    Moreover, if Defendants terminated the contract due to an incorrect belief that LaTorre was the leaker, that situation would not, on its own, rise to a First Amendment violation because the "speech" at issue did not, according to LaTorre, even occur. See Fogarty, 121 F.3d at 891 ("We conclude that the absence of speech – in fact, its explicit disclaimer by plaintiff – is fatal to the plaintiff's [First Amendment] claim.").

Accordingly, this element properly remains a question of fact for the jury. As a result, the Court will also deny Defendants' motion for summary judgment.[14]

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny both motions for summary judgment.

---

[14]  There is a third and final element of the First Amendment retaliation analysis – whether the same action would have been taken in the absence of the speech at issue. But this element, which places the burden on the defendant, comes into play only if the plaintiff has first established that his speech is protected by the First Amendment and was a substantial or motivating factor in the action taken. Here, Plaintiffs have not established as much, and Defendants make no argument with respect to this element, so the Court need not consider it.